Filed 10/23/20  P. v. Triggs-Nunez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C084647 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF161834) |
| v. | |
| MICHAEL ANGELO TRIGGS-NUÑEZ, | |
| Defendant and Appellant. | |

A jury found defendant Michael Angelo Triggs-Nuñez guilty of five counts of oral copulation or sexual penetration of a child 10 years of age or younger, two counts of lewd and lascivious acts upon a child under the age of 14, and one count of attempting to dissuade a witness.  The trial court sentenced defendant to 75 years to life plus 12 years.  On appeal he raises claims of insufficient evidence, juror misconduct, evidentiary error, instructional error, prosecutorial error, and cumulative error.  He also contends the trial court made multiple sentencing errors.  We affirm but correct the abstract of judgment to

1

properly reflect the trial court's order prohibiting the defendant visitation with the victim until she is 18 years old.

## FACTUAL AND PROCEDURAL BACKGROUND

The victim, defendant's daughter, came to live with him when she was five years old. Before that, she predominantly lived with her mother, Elizabeth, in the Bay Area. Once with defendant, the victim continued to see her mother every other weekend or so. The informal custody arrangement allowed Elizabeth to see the victim multiple weekends in a row or skip weekends when she was busy with work. Defendant and Elizabeth communicated primarily through text and had a good coparenting relationship.

When the victim was in kindergarten, she slept on a black futon in the living room of defendant's home. Also living with defendant was defendant's brother and his girlfriend. Living on the property was defendant's mother and her husband, who occupied a house within view of defendant's home. Defendant's uncle also had a house within view and on the property. Defendant's grandchildren would come and visit often and stay with him for the summer.

The entire family was very close and loving. Everyone walked in and out of each other's houses and rarely locked doors. They would eat meals together multiple times a week and spend countless hours living and working around each other. The victim had a close relationship with her grandmother and her uncle's girlfriend. She shared "secrets" and "stories" with them; and confided in them, although never about what defendant did to her. Both women previously had conversations with the victim about harmful touching.

One night, when the victim was on the black futon, defendant told her to put a blanket over her head and not to look, he then pulled her pants down, spread her legs, and licked her vagina. He told her married people do this, and that she needed to keep it a secret or her entire family would go to jail.

2

Her dad did this same thing to her when she was in first grade and had moved into her own bedroom. The victim remembered it occurring more than once in her bed, at least one of which happened during the day. It happened the same way it had before -- the victim put her head on her pillow with a blanket over her head after defendant told her not to look. Defendant then pulled down the victim's pants, spread her legs, and licked her vagina.

Another night, while the victim was at the head of her bed, defendant came into her room, pulled down her pants, and stuck his finger in her rectum. It felt bad and made the victim feel like she had to go to the bathroom. Defendant did not say anything, but the victim made "funny" noises to make him stop, which he did.

Also while in the victim's bedroom, defendant kissed her like "married people" by putting his tongue in her mouth. She did not like it and thought it was disgusting. This happened more than once. Defendant also "sucked" on the victim's "chee-chees" about three times; once on the black futon and the rest on her bed.

Defendant also masturbated in front of the victim while sitting in a black chair in the living room of the home. When he was done he made the victim lick the ejaculate off his penis. This happened only once.

A few weeks after moving into her new bedroom, the victim told her mother what defendant did to her. Elizabeth told her boyfriend about the victim's disclosure and arranged a meeting between defendant and her boyfriend under the guise of defendant picking up the victim. Instead, defendant's brother showed up to the meeting intending to pick up the victim for a custody exchange. Elizabeth's boyfriend was there with his son. The men yelled at defendant's brother and acted extremely threatening toward him before realizing he was not defendant. The men also made several statements about defendant's home and neighborhood, implying they had been watching defendant without his knowledge. Defendant's brother then spoke with Elizabeth on the phone, where she told him defendant had been molesting the victim.

Elizabeth then texted defendant multiple times that he would "rot in prison" because of the "sick shit" he did to her baby.  She also accused him of orchestrating a fake custody battle as a cover for her allegations.

After defendant's brother got home from his encounter with Elizabeth's boyfriend, he and defendant installed blinds in their home.  Defendant then left the property and went to a friend's house without telling his family where he was going.  Defendant did contact his family law attorney, who in turn contacted the Yuba County Sheriff's Department about defendant surrendering himself four to five days into the future.  That offer was rejected by the sheriff's department, but defendant's family law attorney was unsuccessful at communicating that information to defendant.  Defendant was eventually arrested at his friend's home.[1]

## DISCUSSION

## I

### Insufficient Evidence

Defendant brings two sufficiency of the evidence claims.  He first attacks the evidence as failing to support the intimidation of a victim conviction because it does not show he intended to affect or influence his victim's testimony.  He also attacks the evidence as failing to support his sexual penetration conviction because it did not show he committed the crime with the intent to gain sexual arousal or gratification.  We reject these claims.

---

[1]     Defendant's defense was that the victim's allegations were the product of Elizabeth's influence.  He claimed he and Elizabeth disagreed about future custody arrangements and Elizabeth was resorting to her usual practice of lying and accusing others of abuse to get what she wanted.  Defendant presented evidence Elizabeth had made allegations of physical and sexual abuse when she was younger against her father and stepmother during a custody dispute between her parents.  Defendant also presented evidence of his character and close family ties.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "The standard of review is the same where the prosecution relies primarily on circumstantial evidence." (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 610.) " 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) Before a verdict may be set aside for insufficiency of the evidence, a party must demonstrate " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

A

*Sufficient Evidence Supports Defendant's Intimidating A Victim Conviction*

Defendant was convicted of intimidating a victim pursuant to Penal Code[2] section 136.1, subdivision (b)(2). A defendant is guilty under this section when he or she "attempts to prevent or dissuade another person who has been the victim of a crime . . . from . . . : [¶] (2) Causing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof." (§136.1, subd. (b)(2).) Relying on *People v. Velazquez* (2011) 201 Cal.App.4th 219, defendant contends the evidence did not prove him guilty because it failed to show his statements to the victim were intended to influence her testimony or acts relating to the criminal prosecution. Specifically, he argues his statement the victim's family would go to jail if

---

[2]     Further section references are to the Penal Code unless otherwise indicated.

5

the victim told their secret was made before prosecution was underway and could not have been intended to affect the victim's participation in the case.

In *Velazquez*, the court affirmed the defendant's conviction for the same crime, based on his postarrest attempts to persuade the victim to drop the charges. In doing so, the *Velazquez* court rejected the argument the crime contemplates only prearrest conduct. (*People v. Velazquez*, *supra*, 201 Cal.App.4th at pp. 232-233.) It reasoned, "Unlike section 136.1, subdivision (b)(1), which makes it a crime to attempt to dissuade a crime victim from '[m]aking any report of that victimization to any peace officer . . . or to any judge,' subdivision (b)(2) makes it a crime to attempt to dissuade a victim or witness from '[c]ausing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof.' Subdivision (b)(2) clearly encompasses more than prearrest efforts to dissuade, inasmuch as it includes attempts to dissuade a victim from causing a complaint or information to be prosecuted or assisting in that prosecution." (*Velazquez*, at pp. 232-233.)

Defendant takes this language to hold his prearrest conduct is irrelevant to the question of whether he intended to dissuade his victim from cooperating with the prosecution. Not so. The *Velazquez* court focused on the purpose of the defendant's acts, not when those acts occurred to determine whether the defendant was guilty. (*People v. Velazquez*, *supra*, 201 Cal.App.4th at pp. 232-233.) We shall do the same.

Here, defendant told his daughter not to tell anyone of their "secret" or her entire family -- both sides -- would go to jail. His statement was not merely aimed at stopping the victim from reporting his conduct to the police or another "prosecuting agency" (§ 136.1, subd. (b)(1)), but also aimed at stopping the victim from causing him to go to jail (*id.*, sudb. (b)(2)). Defendant's statements intimidated the victim with the threat that her entire family, including himself, would be jailed if she told their secret. Defendant's focus on state-imposed punishment reveals he intended to stop the victim from cooperating with the prosecution which would lead to his imprisonment. Accordingly,

6

sufficient evidence supports defendant's conviction for intimidating a victim under section 136.1, subdivision (b)(2).

B

*Sufficient Evidence Supports Defendant's Digital Penetration Conviction*

Defendant was convicted of sexual penetration of a child 10 years or younger based on his conduct of penetrating the victim's rectum with his finger. To be guilty of this crime, a defendant must commit it "with the intent to gain sexual arousal or gratification or to inflict abuse on the victim." (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1541.) Defendant contends this standard was not met because there was no evidence showing he acted for the purpose of sexual gratification as opposed to some other reason such as medical necessity. We disagree.

The victim testified defendant stuck his finger in her rectum in a way that was uncomfortable and made it red. In her interview, she said defendant put his finger in her rectum and it hurt "really bad" and made her feel like she had to go to the bathroom. She said defendant did not say anything while he did this but stopped after she made funny noises. Later in the interview, she detailed the incident and said that one night while she was at the head of her bed, defendant pulled her pants down and stuck his finger in her butt.

From this evidence, the jury correctly determined defendant acted with the requisite intent. He committed the act at night and in his victim's bed. When penetrating her rectum, defendant did not explain what he was doing or why, and there is no evidence the victim suffered from a medical issue needing attention. While defendant argues the evidence suggests he was checking for redness, we are not convinced. The victim testified it was defendant's touching that made her rectum red, not that the redness prompted the touching. Moreover, the jury was permitted to consider defendant's other charged offenses and his past convictions when determining whether he intended to sexually gratify himself. (See *People v. Martinez* (1995) 11 Cal.4th 434, 445 [among

7

other circumstances, jury can consider other acts of lewd conduct admitted or charged in the case].)

When assessing the sufficiency of the evidence, we must accept logical inferences the jury might have drawn from the evidence. (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 419.) The fact that defendant committed his acts at night and in the victim's bed and not in a lighted bathroom, dispels any suggestion the defendant penetrated the victim's rectum for medical reasons. Instead, this evidence leads to a more logical inference, especially when considered with defendant's current and past offenses, that defendant penetrated the victim's rectum for the purpose of sexual gratification.

## II

### *There Was No Juror Misconduct*

Defendant contends juror misconduct occurred as a result of the court's failure to properly inquire about an incident involving a juror and a woman associated with Elizabeth where the juror perceived the woman intentionally attempted to hit her (the juror) with a car. We disagree.

### A

### *Background*

During the eighth day of trial, Juror No. 10 reported she was nearly run over in the crosswalk outside the courthouse by someone associated with the parties and that it appeared deliberate given Juror No. 10's role in the case. Juror No. 10 explained she was crossing the street when she saw a woman driving toward her. When Juror No. 10 was in the middle of the crosswalk, the woman continued to drive, forcing Juror No. 10 to stop in the crosswalk. Immediately after the incident, Juror No. 10 told Juror No. 9 about the incident and later told her husband. Juror No. 10 stated she could "[a]bsolutely" serve as a fair and impartial juror and she did not know with which side of the case the woman was associated.

8

The woman Juror No. 10 identified as the person who nearly hit her was already known to the court because it had admonished the woman earlier in the trial to stop sending text messages about the proceedings to Elizabeth. The court had not told people viewing the trial they were prohibited from communicating with witnesses about the proceedings and the woman said she thought she was prohibited from talking to the victim about the trial but not Elizabeth. The woman agreed not to communicate with Elizabeth about the trial. Given this history, the court asked the woman to stop attending trial after it spoke with Juror No. 10. The woman agreed and it does not appear that she attended any further days.

The court then spoke with Juror No. 9 about her conversation with Juror No. 10 regarding the crosswalk incident. Juror No. 9 said she did not see the incident, but Juror No. 10 showed her the woman she thought tried to run over her. Juror No. 9 assumed the woman was with the prosecution because she sat on that side of the courtroom but was not sure with which side of the case the woman was affiliated. Juror No. 9 said she did not speak with anyone about the incident and believed she could serve as a fair and impartial juror. The court directed her not to speak with anyone about the issue and then also directed Juror No. 10 to the same. Neither juror was excused, and neither counsel requested their excusal or further questioning.

Following these interactions, the court deputy told the court Juror No. 8 had spoken with him about the crosswalk incident. When questioned by the court, Juror No. 8 said one of the jurors made a statement to a room full of people, which included eight of the jurors, that one of the people sitting on the prosecutor's side of the courtroom tried to hit Juror No. 10 in the crosswalk. Juror No. 8 stated she could "absolutely" serve as a fair and impartial juror. Neither the prosecution nor defense elected to ask Juror No. 8 any follow up questions. The defense further stated it had a "real reluctance" to question all the jurors on this issue, even though the court was willing. Without objection, the court acknowledged both parties had waived voir dire of the jury on this

9

issue.  The court did not excuse any jurors but did instruct Juror No. 8 in addition to the other jurors not to discuss this issue with anybody and that juror agreed.  The court then denied defendant's motion for a mistrial.

B

*Discussion*

" 'An accused has a constitutional right to a trial by an impartial jury.  [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is " 'capable and willing to decide the case solely on the evidence before it.' " ' " (*People v. Hensley* (2014) 59 Cal.4th 788, 824.)  The trial court has a duty to investigate when it becomes aware of the possibility a juror has committed misconduct or has been exposed to improper influences.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1213.)  The court must make whatever inquiry is reasonably necessary to determine whether to discharge the juror and whether the impartiality of other jurors has been affected.  (*Ibid.*; *People v. Davis* (1995) 10 Cal.4th 463, 535.)  The trial court has great discretion in determining the scope of the inquiry.  (*People v. Virgil* (2011) 51 Cal.4th 1210, 1284.)  Our Supreme Court has "long recognized that, except when bias is apparent from the record, the trial judge is in the best position to assess the juror's state of mind during questioning." (*People v. Clark* (2011) 52 Cal.4th 856, 971.)  "We defer to the trial court's credibility assessments 'based, as they are, on firsthand observations unavailable to us on appeal.' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1262.)

Defendant argues the court was obligated, even in the absence of his trial counsel's statements to the contrary, to inquire more from the jury and the woman alleged to have attempted to run over Juror No. 10, to assure itself the jury was not

10

biased. We disagree and conclude the court's inquiry was adequate and the record does not reveal prejudice on behalf of any juror.[3]

As it pertains to Juror No. 10, the court conducted a reasonable inquiry designed at ascertaining the juror's potential prejudice. It questioned the juror about the details of the crosswalk incident, asked her who she told about the incident and whether she could remain an impartial juror. These questions were designed to ascertain the influence the incident had on Juror No. 10 and any potential bias resulting from the incident. While the court acknowledged Juror No. 10 told it a different story regarding who she told about the incident than what it learned from other jurors, it was within the court's discretion not to investigate those inconsistencies.

Importantly, the details of the crosswalk incident remained the same regardless of the juror being questioned, the only inconsistencies were who Juror No. 10 purported to tell about the incident versus who knew about the incident. However, it is not apparent, as defendant suggests, that any one juror was lying about the communication of the crosswalk incident. The incident and communication of it occurred earlier in the week from when it was reported to the court and the inconsistencies could be the result of memory lapses or overheard conversations. Neither the trial court nor counsel stated any of the jurors were less than forthcoming or seemed evasive in their answers. We decline to question the court's credibility assessment and read deception into any of the jurors' interactions with the court. (See *People v. Williams*, *supra*, 61 Cal.4th at p. 1262.)

---

[3] The People argue defendant forfeited this claim because he did not object to any juror's continued service and waived questioning of those jurors. This argument ignores the fact that defendant moved for a mistrial, thus preserving his claim for appeal. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1341 [defendant's claim of misconduct forfeited where trial counsel failed to propose additional questions, object to juror's continued service, or request a mistrial].)

11

Further, the jurors questioned about the crosswalk incident all stated they could be fair and impartial and the court, at defense counsel's urging, stopped questioning the jury panel because it was worried it would amplify prejudice that did not otherwise exist. By all indication, no juror appeared alarmed by the crosswalk incident, or Juror No. 10's communication of it, and those questioned found it inconsequential to their service as jurors. Absent indication jurors were being intentionally untruthful or that they could not be impartial, the court was not required to further inquire of Juror No. 10 or other jurors on the panel.

The court further acted within its discretion when questioning the woman alleged to have attempted to run over Juror No. 10. Defendant disagrees and argues the court should have questioned the woman about the crosswalk incident, especially because she was involved in an earlier texting incident. What really happened, however, is irrelevant. Juror No. 10 thought the woman intentionally tried to run her over. As it relates to our inquiry, it is the juror's state of mind that drives the inquiry. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1213.) Facts outside the juror's knowledge can hardly influence his or her bias.

Further, the court investigated the earlier text messaging incident and found the woman truthful when she said she did not know she was barred from contacting Elizabeth about the trial. We accept the court's credibility determination in that regard. When it asked the woman to stop coming to the courthouse for the remainder of trial, she agreed and did not argue with the court. Given the woman's willingness to cooperate throughout trial, the court reasonably did not inquire further into the crosswalk incident.

Given the court's adequate inquiry and the lack of prejudice evidenced in the record, we conclude there was no juror misconduct.

III

*Evidentiary Error*

A

*Evidence Code Section 1108 Evidence*

Defendant raises two evidentiary issues related to the uncharged sex offenses admitted against him under Evidence Code section 1108. He first argues the evidence should have been excluded because it was more prejudicial than probative pursuant to Evidence Code section 352. Secondly, he argues the admission of his uncharged sexual offenses to prove his propensity to commit sex crimes violates due process.[4] We disagree.

1

*Background*

Prior to trial, the prosecution moved to admit evidence of defendant's uncharged sexual offenses pursuant to Evidence Code section 1108. In its written in limine motion, the prosecution proffered the testimony of defendant's prior victim, her father, and defendant's probation officer but conceded defendant's prior victim would constitute the bulk of the testimony. Through this testimony, the prosecution sought to illustrate the sexual offenses defendant committed in 2010 and 2011 when his prior victim was 14 years old. "Defendant was friends with [his prior victim's] family from church and refused to keep his relationship with [his prior victim] as just-friends . . . ." "Even after being told by [the prior victim's father] to stay away from [the prior victim], [d]efendant committed the prowling offense and was placed on probation for it. Nevertheless, he continued his secret, sexual relationship with [the prior victim]. After more criminal

---

[4]     Defendant also argues the prosecutor committed error related to the Evidence Code section 1108 evidence. We will address this claim with defendant's other prosecutorial error claims.

charges, felony convictions, and felony probation, he violated probation by having telephonic contact with [the prior victim] behind her parents' back."

Defendant's convictions from 2010 and 2011 were summarized earlier in the prosecution's written in limine motion. His 2010 conviction was for misdemeanor prowling, "when he was caught *for the second time* in the backyard of his 14-yr-old girlfriend's . . . home after being admonished by [her] father not to have any contact with her. He climbed over a locked gate to get access to the yard. A trespassing charge . . . was dismissed with that plea. In the dismissed case, [d]efendant parked in a nearby field and went to [his prior victim's] house, knocked until she answered, and then went with her to her bedroom, where he went to talk until he was found on her bed by her father."

Defendant had three felony convictions in 2011 for unlawful sexual intercourse of the same victim as the 2010 conviction. "Counts of sodomy and oral copulation with a minor were dismissed pursuant to his plea. He told [his probation officer] that his romantic feelings for [his prior victim] began when she was 13 years old, when he would have been 19 years old."

The court admitted this evidence over defendant's objection and the prior victim's father, the prior victim, and defendant's probation officer testified to the facts outlined above. During defendant's prior victim's testimony, however, the court excluded testimony that defendant sodomized his prior victim on Evidence Code section 352 grounds but allowed testimony related to the oral copulation charge. It reasoned that potential prejudice influenced its decision and, because defendant's current victim alleged only digital penetration, there was limited to no relevance in admitting evidence regarding genital penetration.

## 2

### *The Court Did Not Abuse Its Discretion Under Evidence Code Section 352*

Propensity evidence is admissible in sex offense cases under Evidence Code section 1108 "if the evidence is not inadmissible pursuant to [Evidence Code] Section

14

352." In other words, "[w]hen a defendant is accused of a sex offense, Evidence Code section 1108 permits the court to admit evidence of the defendant's commission of other sex offenses, thus allowing the jury to learn of the defendant's possible disposition to commit sex crimes." (*People v. Cordova* (2015) 62 Cal.4th 104, 132.) Such evidence "is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." (*Ibid.*; Evid. Code, § 352 [evidence is excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury"].)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) We review a trial court's admission of evidence for abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61.)

Defendant argues admission of the uncharged sex acts evidence violated Evidence Code section 352 because evidence of those crimes differed drastically from his current crimes. He makes much of the fact that his prior victim was 14 years old when he had sex with her and was not a prepubescent child as was his daughter. This, defendant argues, is important because of the mental development of a child under 14 years old, who presumptively lacks the capacity to consent, and a child 14 years or older, "who has both sexual desire and romantic aspirations." He also points to the fact his prior victim was a friend as opposed to a familial relation like his daughter. We are not persuaded.

15

Defendant committed the uncharged offenses in 2010 and 2011, close in time to the charged offenses, which were alleged to have occurred between 2014 and 2016. The temporal proximity of these acts is "a relevant factor for the court to consider in exercising its discretion." (*People v. Cordova*, *supra*, 62 Cal.4th at p. 133.) This "permitted the inference that defendant had a propensity to commit such [misconduct]." (*Id*. at p. 134.)

Further, while defendant focuses on the differences of his chosen victims, he ignores the similarity of his offenses. In both cases defendant orally copulated a person much younger than himself. While defendant's prior victim may have been postpubescent, she was still five to six years his junior and barely a teenager when defendant was an adult. This is indicative of predatory behavior regardless of whether his prior victim had started her period. " 'Many sex offenders are not "specialists", and commit a variety of offenses which differ in specific character.' " (*People v. Soto* (1998) 64 Cal.App.4th 966, 984.)

Also, secrecy defined both of defendant's illegal sexual relationships. Part of defendant's defense was that he lived with and was close to his family, making it impossible to keep something like his sexual relations secret from them. Yet, defendant's family knew nothing about his sexual relationship with a 14-year-old family friend until he was arrested, despite defendant and his prior victim having sex in the house defendant shared with his brother. Facts similar to the instant case.

Moreover, the testimony on the topic was relatively brief, which ensured the jury would not expend an inordinate amount of time "trying the uncharged offense[]" so as to "dwarf[] the trial on the current charge [and] unfairly prejudice the defendant." (*People v. Frazier* (2001) 89 Cal.App.4th 30, 42.) Defendant argues calling the three witnesses (defendant's prior victim, her father, and defendant's probation officer) was unnecessary and contributed to the undue prejudice. We disagree. The three witnesses were necessary to establish the secret nature of the relationship and defendant's continued

16

attempts to maintain the secret relationship despite having been criminally punished. Although there were three witnesses, each witness's testimony was short and related only necessary evidence.

Finally, it is not likely the facts of the uncharged offenses prejudiced the jury against defendant to such a degree it could not weigh the evidence fairly in this case. The jury was told defendant had already been punished for these crimes. Further, defendant's uncharged offenses were less serious, and the context of the offenses were related to the jury. Given the similarity of defendant's prior and current offenses and the lack of undue prejudice, the trial court did not abuse its discretion by admitting the facts of defendant's prior sex offenses.

3

*Evidence Code Section 1108 Does Not Violate Due Process*

Defendant contends Evidence Code section 1108 violates due process. We disagree. In *People v. Falsetta* (1999) 21 Cal.4th 903, our Supreme Court upheld the constitutionality of Evidence Code section 1108, permitting admission of a defendant's other sex crimes in a prosecution for a sexual offense. (*Falsetta*, at p. 907.) Rejecting the defendant's argument Evidence Code section 1108 violates due process principles by allowing admission of propensity evidence, the court concluded that "in light of the substantial protections afforded to defendants in all cases to which [Evidence Code] section 1108 applies, we see no undue unfairness in its limited exception to the historical rule against propensity evidence." (*Falsetta*, at p. 915.) We are bound by this ruling and must reject defendant's argument to the contrary. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[5]

---

[5] Additionally, the federal courts have rejected the same due process contention defendant makes here relative to the federal analogue to Evidence Code section 1108, rule 413 of the Federal Rules of Evidence. (See *People v. Phea* (2018) 29 Cal.App.5th

17

B

*The Trial Court Did Not Abuse Its Discretion By Allowing Expert*

*Testimony About False Allegations Of Child Sexual Assaults*

Defendant contends the trial court erred by allowing the prosecution's expert in child sexual assault accommodation syndrome to testify outside of that expertise when testifying false allegation studies showed children did not falsely report sexual abuse. We disagree.

1

*Background*

Before the prosecution's expert in child sexual assault accommodation syndrome testified, defendant objected to the entire testimony and any mention of percentages. The court agreed to the latter but allowed the expert to testify. The expert testified to the five-part accommodation syndrome, which consists of: 1) secrecy; 2) helplessness; 3) entrapments/accommodation; 4) delayed unconvincing disclosure; and 5) recantation or retraction. About recantation and retraction, the expert testified that while the article explaining the syndrome said some children retract allegations of abuse, we now know that to be a minority of cases.

On cross-examination, defendant asked the expert about false allegations of sexual abuse. The expert testified the accommodation syndrome did not address false allegations and that research supported the conclusion false allegations of sexual abuse occur. On redirect, the expert testified false allegations were rare. After objection, a sidebar, and the court's warning for the prosecution not to elicit percentages, the prosecutor elicited that false allegations of sexual abuse in child custody situations were rare and, when made, it was never by the child in question. In fact, a Canadian study that

---

583, 604 [discussing and citing numerous federal circuit court opinions rejecting due process claims as to Federal Rules of Evidence, rule 413].)

researched 800 cases of sexual abuse found that in none of the cases was it the child who falsely reported the abuse.

## 2

### *Discussion*[6]

" 'Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred.' " (*People v. Perez* (2010) 182 Cal.App.4th 231, 245.)  In other words, it is impermissible to say "that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393.)  The evidence is admissible to "disabus[e] a jury of misconceptions it might hold about how a child reacts to a molestation" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744) and to show "that the alleged victim's reactions as demonstrated by the evidence were not inconsistent with . . . having been molested." (*Patino*, at p. 1745.)  To the extent the expert described the findings of different studies, experts are permitted to provide general information acquired through their training and experience, as long as it does not elicit case-specific facts.  (*People v. Sanchez* (2016) 63 Cal.4th 665, 676.)

Defendant's problem is not with the expert's testimony regarding accommodation syndrome, but with his testimony regarding false allegations.  What defendant fails to acknowledge is that it was he who brought up the topic of false allegations, eliciting that research supports the conclusion false allegations of child sexual abuse occur.  To explain this testimony, the prosecution was permitted to question the expert about the studies supporting it as long as the questions did not elicit case-specific facts.  (Evid. Code,

---

**6**     The People argue defendant forfeited this claim because although he objected to admission of the expert's testimony regarding false allegations, he did not request a motion to strike the testimony.  We think defendant's objection was sufficient to preserve this claim for review.

§§ 356, 802; *People v. Sanchez, supra*, 63 Cal.4th at p. 676.) Here, the expert's testimony did not contain case-specific facts, did not vouch for this victim's testimony, and did not give the jury a checklist whereby to test the victim's credibility.

In his reply brief, defendant points us to two cases where this expert's testimony was found to be improper and "did not aid, but supplanted, the jury in its decision on whether the child complainant's testimony was credible." (*People v. Wilson* (2019) 33 Cal.App.5th 559, 569; see also *People v. Julian* (2019) 34 Cal.App.5th 878, 886.) In both cases the prosecution introduced evidence that false allegations of child sexual abuse were rare and occur in about 4 percent of cases. Further, a study demonstrated that when false allegations were made, they were never made by the child. (*Julian*, at pp. 883-884; *Wilson*, at p. 568.) These cases are different from the one before us as we explain.

In those cases, it was the prosecution that first introduced evidence outside of the accommodation syndrome, whereas here it was the defense. Defendant sought to leave the jury with the impression the scientific research supported his defense that he was falsely accused of child sexual abuse; however, this is not what the research suggested. Defendant cannot pick and choose the portions of the research favorable to his case. Further, the expert never testified to the percentage of false allegations other than to say they were rare, and one study found they were never made by the child. Without statistical evidence, the jury was not placed in the same situation as the jury in *Julian* and *Wilson*. Whereas those juries there were told the victim was credible to a certain percent certainty; this jury was told to determine for itself the victim's credibility. And the jury was instructed it had to determine the victim's credibility. (CALCRIM No. 226) Thus, because the expert's testimony regarding the false allegation study did not include case-specific facts or attest to the credibility of the victim, the court did not abuse its discretion by allowing the expert to testify about the particulars of the false allegation study.

20

IV

*Instructional Error*

Defendant raises two instructional error claims.  We review defendant's claims of instructional error de novo.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

A

*Defendant Forfeited His Challenge To The Inclusion Of The*

*Bracketed Sentence Of CALCRIM No. 358*

CALCRIM No. 358 states: "You have heard evidence that the defendant made [an] oral or written statement[s] (before the trial/while the court was not in session).  You must decide whether the defendant made any (such/of these) statement[s], in whole or in part.  If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict.  It is up to you to decide how much importance to give to the statement[s].  [¶]  [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]"

Defendant contends the trial court erred by failing to instruct with the bracketed sentence when instructing the jury on CALCRIM No. 358.  He acknowledges he did not request the bracketed sentence and our Supreme Court has concluded trial courts have no sua sponte duty to give the instruction at all.  (See *People v. Diaz* (2015) 60 Cal.4th 1176, 1188-1189.)  Regardless, he argues that because the trial court instructed on part of CALCRIM No. 358, it was required to also give the bracketed portion considering defendant was alleged to have made multiple incriminating oral statements.  We disagree.

The " ' "purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made." ' " (*People v. Diaz*, *supra*, 60 Cal.4th at p. 1186.)  The instruction "is concerned with the reliability and credibility of the witness who testifies about the defendant's statements."  (*Id*. at p. 1187.)

Historically, trial courts had a sua sponte obligation to give CALCRIM No. 358. The *Diaz* court discarded this sua sponte duty. (*People v. Diaz*, *supra*, 60 Cal.4th at pp. 1188-1189.) In doing so, the court reasoned that courts "are now required to instruct the jury, in all criminal cases, concerning the general principles that apply to their consideration of witness testimony." (*Id.* at p. 1190.) The court further held the instructions on witness credibility, such as CALCRIM No. 226, were sufficient to inform the jury "of the need to evaluate the witnesses' testimony for possible inaccuracies and determine whether the statement was in fact made." (*Diaz*, at p. 1196.)

These considerations are equally applicable to the bracketed portion of CALCRIM No. 358 as they are to the instruction itself. Defendant does not argue why the other instructions were insufficient and required the court to also instruct on the bracketed portion. Nor does defendant argue why the instruction as given was an incorrect statement of the law without the added bracketed sentence. Accordingly, defendant forfeited his claim the trial court should have included the bracketed sentence when instructing on CALCRIM No. 358.

B

*The Court Did Not Abuse Its Discretion When*

*Instructing The Jury On Flight*

An instruction on flight is properly given if the defendant's flight reflected consciousness of guilt. "Flight requires neither the physical act of running nor the reaching of a far-away haven." (*People v. Cannady* (1972) 8 Cal.3d 379, 391.) Flight manifestly does require, however, a purpose to avoid being observed or arrested. " 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." ' [Citations.] Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.] To obtain the instruction, the

22

prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

The evidence showed Elizabeth confronted defendant with the victim's accusations. This was done through text messages from Elizabeth to defendant and by Elizabeth to defendant's brother during the violent encounter with Elizabeth's boyfriend, where the boyfriend also insinuated he was stalking defendant and his family. After hearing these accusations and hanging blinds in his home, defendant left and did not return. He was gone several days until he was arrested at a friend's house. During this time, defendant contacted his family law attorney who unsuccessfully attempted to arrange a surrender of defendant four or five days in the future. The attorney was also unsuccessful at contacting defendant about the rejection.

Defendant argues this was not substantial evidence of flight because there is nothing to indicate he attempted to avoid detection or arrest. Indeed, defendant left his home because of the violent encounter with Elizabeth's boyfriend. Further, defendant contacted his family law attorney and attempted to surrender himself to police.

Defendant's interpretation of the evidence is but one interpretation. Indeed, the court was sympathetic and thought it equally plausible the evidence could be interpreted against flight. This explains why defense counsel agreed to the giving of the flight instruction in exchange for a special instruction on the absence of flight[7] being given as well. In any event, the evidence is subject to other interpretations. For instance, defendant learned of Elizabeth's intent to report his crimes to police and fled from his

---

[7] The court instructed the jury on the absence of flight as follows: "The absence of flight of a person immediately after the commission of a crime, or after he is accused of a crime that may have been committed, is not sufficient in itself to establish his guilt. But is a fact which, if proved, the jury may consider in deciding his innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

home where he knew police would be looking to arrest him. He contacted his family law attorney in a bid to gain several more days of freedom but did not remain in communication with either the attorney or family members, or tell them his location. This conduct is indicative of avoiding detection and shows a consciousness of guilt.

## V

### *Prosecutorial Error*

Defendant raises several claims of prosecutorial error. He acknowledges he did not object on those grounds or request a curative instruction in the trial court as is required to preserve the issues for appeal. Regardless, he argues objection would have been futile and alternatively urges us to reach the merits of his claims under the rubric of ineffective assistance of counsel. We conclude no prejudicial error occurred.

### A

### *Relevant Law*

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom." (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.) "Within the scope of permissible prosecutorial argument, a prosecutor is given wide latitude during argument ' " ' "as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be

24

drawn therefrom. . . .” ’ ” ’ ” (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1529.)
“A prosecutor may ‘vigorously argue his case and is not limited to “Chesterfieldian
politeness” ’ [citation], and he may ‘use appropriate epithets warranted by the
evidence.’ ” (*People v. Fosselman* (1983) 33 Cal.3d 572, 580.)

B

*Forfeiture*

“As a general rule a defendant may not complain on appeal of prosecutorial
misconduct unless in a timely fashion -- and on the same ground -- the defendant made an
assignment of misconduct and requested that the jury be admonished to disregard the
impropriety.” (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  “A defendant will be
excused from the necessity of either a timely objection and/or a request for admonition if
either would be futile.  [Citations.]  In addition, failure to request the jury be admonished
does not forfeit the issue for appeal if ‘ “an admonition would not have cured the harm
caused by the misconduct.” ’ ” (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

Defendant argues his objections were futile in light of the court’s in limine rulings,
frequent rejection of defense counsel’s objections, and repeated assistance to the
prosecution.  We do not agree with defendant’s interpretation of the record.  The court
frequently sustained defense counsels’ objections, chastised the prosecutor without
prompting from defense counsel, and excluded evidence offered by the prosecution.
The court held frequent conversations outside of the jury’s presence, hearing argument
from counsel concerning evidentiary and jury instruction issues.  At no point did the
court imply to defense counsel that objections would not be entertained.  Thus, objections
were not futile and defendant has forfeited his contentions.

C

*Counsel Was Not Ineffective*

We address the merits of defendant’s ineffective assistance of counsel claim and
consider whether defendant has shown prosecutorial error or made a sufficient showing

25

of prejudice. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674, 699].)

Defendant's first claim of prosecutorial error involves the prosecution's use of the facts underlying his prior sex offenses without providing proper notice of its intent to do so. Specifically, defendant argues the prosecution notified him of its intent to admit the facts of his unlawful sexual intercourse with a minor conviction and not that he also orally copulated his prior victim. We disagree with defendant's interpretation of the record.

As discussed, the prosecution filed written in limine motions. In it, the prosecution summarized defendant's prior conviction for prowling and then his prior convictions for unlawful sexual intercourse with a minor. The unlawful sexual intercourse with a minor convictions were described as occurring in 2011 and that "[c]ounts of sodomy and oral copulation with a minor were dismissed pursuant to his plea." The written motions thereafter included the prosecution's intent to proffer the testimony of defendant's prior victim, her father, and defendant's probation officer to illustrate the sexual offenses defendant committed in 2010 and 2011 when his prior victim was 14 years old. Thus, the prosecutor did notify defendant of the particular offenses he was going to question defendant's prior victim about and was not deceptive as defendant argues.

Defendant's next claim of prosecutorial error takes issue with the prosecutor's repeated description of defendant's prior sex offenses as statutory rape instead of the modern and more appropriate description of unlawful sexual intercourse with a minor. The Legislature removed the crime of statutory rape on a child under the age of 18 from the rape statute (§ 261) and renamed it "[u]nlawful sexual intercourse" with a person under the age of 18 (§ 261.5). (See *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 884-885.) "[I]n separating and renaming the offense of unlawful sexual intercourse,

26

the Legislature sought to eliminate, for section 261.5 offenses, the social stigma associated with the rape label . . . ." (*Johnson*, at p. 885.)

We agree the more appropriate description of the offense is unlawful sexual intercourse with a minor and not the antiquated term "statutory rape." We need not determine whether the prosecutor's conduct was error, however, because defendant cannot show he was prejudiced by his counsel's failure to object to the prosecutor's use of the term. The facts underlying defendant's prior sex offenses were admitted into evidence and the jury got to judge the conduct for itself regardless of the title the prosecutor gave it. Thus, counsel was not ineffective.

Defendant next claims the prosecutor committed misconduct by misstating the reasonable doubt standard during his rebuttal argument and in his PowerPoint rebuttal presentation. Specifically, defendant takes issue with the prosecutor's invitation to the jury to picture itself meeting the victim someday and being able to say, " 'I remember. I was there. I heard it. And I believed you and I did the right thing,' that's an abiding conviction." Defendant also contends this statement constituted vouching, inasmuch as it suggested the jury would feel good telling the victim it believed her. He further contends the statement references matters outside the record. We disagree.

This case rested primarily on the credibility of the parties as many cases such as these do. There were no witnesses to defendant's conduct and no physical evidence of defendant's crimes. The prosecution's case came down to whether the jury believed the victim's testimony and allegations of sexual abuse. Taken reasonably, that is what the prosecutor's statements meant -- if you believe the victim and would still hold that belief with time, then that is an abiding conviction of defendant's guilt. This is not a misstatement of the law. (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 31 [The term " 'abiding conviction' " in the reasonable doubt instruction " 'convey[s] the requirement that the jurors' belief in the truth of the charge must be both long lasting and deeply felt.' "].)

27

Neither did the prosecutor vouch for the victim nor allude to evidence outside the record. "It is improper for a prosecutor to offer assurances that a witness is credible or to suggest that evidence available to the government but not before the jury corroborates the testimony of a witness." (*People v. Cook* (2006) 39 Cal.4th 566, 593.) The prosecutor did not assure the jury of the victim's credibility but kept the focus on the jury's state of mind and decision-making process. Further, the prosecutor's comments did not refer to evidence not presented that confirmed defendant's guilt. Thus, defendant's claims in this regard fail.

Defendant's argument seems to be that the prosecutor improperly appealed to the sympathies of the jury by invoking the image it may meet the victim one day and talk about the case. Indeed, defendant alludes to this argument again when claiming the prosecutor erred by repeatedly referring to the victim, who testified on her seventh birthday, as the birthday witness.[8] We believe appealing to the jury in this way inappropriate but we need not determine whether it amounted to error because defendant cannot show prejudice. First, while the prosecutor referred to the victim's birthday once during opening argument, three times during closing argument, and twice in a

---

[8] Defendant brings this claim of error as an improper comment on his right to have a trial because the prosecutor mentioned defendant's trial right in relation to his daughter's birthday. Specifically, during closing argument the prosecutor said it was defendant's right as an American citizen to have a jury trial, "to have 12 people -- 13 people come and sit and watch his daughter testify on her seventh birthday about what he did to her." Defendant fails to include the remainder of the prosecutor's remarks on the subject: "We all have that right. And we have the obligation, as the People, to prove a case beyond a reasonable doubt. We all support that. That's why you're here." Taken reasonably, the prosecutor's comments did not urge the jury to hold defendant's exercise of the right to trial against him, but served as an explanation of what that right entailed. (Compare to *United States v. Smith* (11th Cir. 1991) 934 F.2d 270, 275 [prosecutor's remark the defendant " 'has not taken responsibility for his actions' " because he refused to plead guilty, unlike his codefendants who entered guilty pleas, was improper].)

28

PowerPoint presentation, that is not so often considering the trial was a month long, with an extensive closing argument consisting of 63 PowerPoint slides.

Further, the jury was instructed not to "let bias, sympathy, prejudice or public opinion influence [its] decision," and to "follow the law as [the court] explain[s] it to you, even if you disagree with it." The jury was instructed on the presumption of innocence, the prosecution's burden of proof, and again on its duty to impartially weigh the evidence. When instructing on witness credibility, the jury was told "[y]ou must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have." In short, the court repeatedly impressed upon the jury its duty to be impartial and it is not reasonable to assume the jury allowed the prosecutor's appeals to override that duty. "We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Dalton* (2019) 7 Cal.5th 166, 260.)

Defendant next argues the prosecutor suggested to the jury to consider religion when assessing credibility. Defendant points to the prosecutor's PowerPoint presentation as proof of the prosecutor's intent. He argues the PowerPoint instructed the jury to weigh a defense witness's Jehovah Witness faith against her credibility, while it instructed the jury to weigh a prosecution witness's lapsed faith of the same religion in her favor. He also points to the prosecutor's repeated inquiry into the religious affiliation of several defense witnesses as confirming the prosecutor's intent. We disagree.

The prosecution's mention of and inquiry into the religious affiliation of several witnesses was for the purpose of establishing those witnesses' relationship to defendant. For instance, Elizabeth testified she met defendant through their Jehovah Witness faith. That is also how defendant met his prior victim and his prior victim's father. In fact, that is how defendant knew most of the witnesses, including Elizabeth's father who testified to beliefs of the religion when explaining why he had a close relationship with Elizabeth despite not seeing her on holidays. While the prosecutor's PowerPoint presentation

29

provides that Elizabeth was a lapsed Jehovah's Witness and defendant's brother's girlfriend attended the same congregation as defendant's family, he explained in his closing argument this was a summation of those witnesses' testimony given the time that had passed since the jury first heard it. Taking the prosecutor's statements as a whole, it is not reasonable the jury interpreted them as indicating defense witnesses were untrustworthy based on their religion.

Defendant's final contention of prosecutorial error relates to statements the prosecutor made during his opening argument. Defendant contends the prosecutor related statements the victim told her mother when initially disclosing defendant's sexual abuse, despite the trial court's ruling those statements were to be excluded. The People agree the prosecutor's argument was error but contend defendant cannot show prejudice. We agree with the People and detect no prejudice because the victim actually made the statements the prosecutor attributed to her during the forensic interview. Any failure to present evidence those statements were also uttered to the victim's mother can be weighed only against the prosecutor who promised the allegations would be corroborated in this way during his opening argument. In summary, we conclude defense counsel was not ineffective for failing to object to the prosecutor's perceived acts of error.

VI

*There Was No Cumulative Error*

Defendant contends cumulative error resulted from the individual errors he previously argued. As we have discussed, no error occurred. To the extent the prosecutor's inappropriate remarks regarding statutory rape, the victim's birthday, and the victim's initial disclosure could be construed to constitute error, we believe those errors cumulatively harmless for the reasons stated in those discussions.

30

## VII

*Sentencing Claims*

### A

*The Trial Court Did Not Abuse Its Discretion When Sentencing*

*Defendant Consecutively To Counts 1 Through 5*

Defendant contends the trial court abused its discretion when sentencing him to five consecutive 15-year-to-life terms because the evidence does not support the finding defendant committed the offenses on separate occasions, nor does it support the other aggravating factor relied upon by the court. We disagree.

### 1

### *Background*

Over defendant's argument to the contrary, the court imposed five consecutive sentences of 15 years to life for counts 1 through 5. Count 1 referred to defendant's digital penetration of the victim's rectum when the two were in her room. Count 2 referred to the victim's oral copulation of defendant in the black chair. Count 3 referred to defendant's oral copulation of the victim on the black couch. Count 4 referred to defendant's oral copulation of the victim in her bedroom. And count 5 referred to a second act of oral copulation on the victim in her bedroom.

When finding these offenses occurred on separate occasions, the court said: "The [L]egislature has created a sentencing scheme that allows for concurrent -- excuse me -- consecutive and/or concurrent sentencing as to some of these counts. To give Defendant a volume discount or bulk discount after trial sends the wrong message and would be inappropriate. [¶] Any of these acts in and of themselves calls for a life sentence. He will be sentenced accordingly. [¶] The Court adopts the sentencing scheme outlined as put forth by the Probation Department. The factors in aggravation are true. He's not eligible for probation. Victim was extremely vulnerable. Defendant took advantage of a position of trust. Prior convictions are of increasing seriousness. Prior performance on

31

probation was unsatisfactory.  These crimes were independent of each other.  They took place while relatively close in time but are separate offenses, necessitating consecutive sentencing.

2

*Discussion*

Section 669, the general sentencing statute for conviction of multiple offenses, applies to defendant's offenses charged in counts 1 through 5.  That provision requires the trial court to determine whether to run the sentences for the multiple convictions concurrently or consecutively, the former being the default.  (§ 669, subd. (a); see also *In re Calhoun* (1976) 17 Cal.3d 75, 80 ["If no decision is made, the terms run concurrently"].)  How to run the sentences is left to the trial court's sound discretion, but if it chooses to run them consecutively, it must provide its reasons for doing so.  (§ 1170, subd. (c); *People v. Champion* (1995) 9 Cal.4th 879, 934.)  "Defendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion."  (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)

Criteria affecting whether to impose consecutive rather than concurrent sentences include whether:  "(1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."  (Cal. Rules of Court, rule 4.425(a).)  In addition, "[a]ny circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's sentence in prison or county jail under section 1170(h); and (3) A fact that is an element of the crime may not be used to impose consecutive sentences."  (Cal. Rules of Court, rule 4.425(b).)  "Absent an explicit

32

statement by the trial court to the contrary, it is presumed the court properly exercised its legal duty to consider all possible mitigating and aggravating factors in determining the appropriate sentence." (*People v. Oberreuter* (1988) 204 Cal.App.3d 884, 888, disapproved on another ground in *People v. Walker* (1991) 54 Cal.3d 1013, 1022.)

Here, the trial court indicated it knew of its discretion to sentence defendant concurrently to his section 288.7 offenses (counts 1 through 5). Indeed, it expressly said as much. Defendant argues the court's statement defendant would not be permitted a "volume discount" despite the crimes occurring close in time showed the court was unaware of the appropriate standard. This argument is conclusively rebutted by the court's express finding the crimes "were independent of each other" and while occurring "relatively close in time," they were still "separate offenses, necessitating consecutive sentencing." Given the court's express finding the offenses were independent of and separate from one another, it is clear the court was aware of the appropriate standard to apply.

So too did the evidence support the court's finding the offenses occurred on separate occasions and were independent of one another. The victim indicated her father orally copulated her on the black futon when she was in kindergarten and again in first grade when she got her own bedroom and slept in a bed. The difference in time and location, and the fact the victim recalled one occurrence in the bedroom to be during the day while the futon occurrence was at night, supports the court's conclusion the offenses occurred at separate times. Similarly, the oral copulation offense occurring while defendant sat in the black chair is separate in location from defendant's other offenses, demonstrating it too is separate and independent of those crimes.

Further, the victim described defendant as having orally copulated her more than once in her bedroom. Defendant argues her statements could be construed to mean the offense occurred more than once or that defendant performed the act of licking her vagina more than once. We disagree. In the victim's forensic interview, she said defendant

33

committed the offense the same way each time -- he put a blanket over her head and told her not to look, he then took off her pants, spread her legs, and licked her vagina.  Thus, when the victim indicated her father did this to her more than once on her bed and only once on the black futon, we take that to mean defendant committed the entire ritual, not a portion of the offense.

Defendant's act of digital penetration of the victim's rectum while she was in her bed is also a separate and independent crime.  In her forensic interview, the victim indicated defendant came into her room, took down her pants, and digitally penetrated her rectum.  The fact the victim remembered defendant walking into the room before committing the offense, suggests he committed the offense on a separate occasion and it was not a continuation of an offense already in progress.  Further, with his act of digital penetration, defendant targeted a different part of the victim's body than during the oral copulation offense.  He further applied force and caused the victim pain in a way she did not experience during the commission of the oral copulation offense.

Because the evidence supported the trial court's finding the offenses occurred on separate occasions and were independent of each other, the trial court did not abuse its discretion by sentencing defendant consecutively.  Thus, we need not address defendant's remaining argument that evidence did not support the aggravating factors.

B

*Defendant's Sentence Was Not Cruel And Unusual*

Defendant contends the five life sentences imposed constitute cruel and unusual punishment under both the state and federal standards.  We disagree.

"Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment."  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.)  A punishment is cruel or unusual in violation of the California Constitution "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the

34

conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) "[W]hen a defendant under an indeterminate sentence challenges that sentence as cruel or unusual punishment in violation of the California Constitution, the test is whether the maximum term of imprisonment permitted by the statute punishing his offense exceeds the constitutional limit, regardless of whether a lesser term may be fixed . . . ." (*Id*. at p. 419.)

In assessing whether the maximum life sentence is " 'out of all proportion to the offense,' " we employ three "techniques" identified by the *Lynch* court. (*In re Lynch*, *supra*, 8 Cal.3d at pp. 424-427.) First, we "examine[] the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*Id*. at p. 425.) Next, we compare the sentence with the "punishments prescribed in the same *jurisdiction* for *different offenses* which . . . must be deemed more serious." (*Id*. at p. 426.) Finally, we compare the sentence with "the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision." (*Id*. at p. 427.)

We begin with the nature of the offenses and the offender. We find *People v. Baker* (2018) 20 Cal.App.5th 711 instructive. There, the defendant was convicted of oral copulation with a child 10 years of age or younger. On appeal, he challenged his mandatory 15-year-to-life sentence. The court observed " '[t]here exists a strong public policy to protect children of tender years,' " and, "[a]long a spectrum ranging from murder, mayhem, and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.' " (*Baker*, *supra*, 20 Cal.App.5th at pp. 724-725.) The *Baker* court also noted, "lewd conduct 'may have lifelong consequences to the well-being of the child.' " (*Id*. at p. 725.)

Here, the sexual offenses were particularly egregious. Defendant committed multiple acts of sexual abuse on his daughter during a prolonged period. The abuse

35

began when the victim was in kindergarten and lasted until she reported her father's conduct in early October of her first-grade year. While defendant did not abuse the victim for years, he demonstrated a pattern of repeated and consistent conduct aimed at a victim who lived with him and loved him. The consistency of defendant's crimes paired with the time period in which they occurred, show defendant had a predatory relationship with his daughter. There is no indication his conduct would have stopped without the victim reporting it or that it was a single period of aberrant behavior.

Aggravating factors relating to the nature of the offenses further support our conclusion. The victim was six years old during the sexual assaults and, therefore, was particularly vulnerable. (Cal. Rules of Court, rule 4.421(a)(3); *People v. Baker*, *supra*, 20 Cal.App.5th at p. 725.) Additionally, the victim was defendant's daughter. Thus, defendant abused a position of trust or confidence during commission of the offenses. (Cal. Rules of Court, rule 4.421(a)(3); *Baker*, at p. 725; *People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413 [aggravating circumstances found where defendant "exploited the cordial relationship he had built up over years" to sexually assault child].)

Facts pertaining to the offender similarly weigh in favor of a finding five consecutive 15-year-to-life sentences is not cruel or unusual. Like the defendant in *Baker*, defendant was an adult. (*People v. Baker*, *supra*, 20 Cal.App.5th at p. 725.) Nothing in the record indicates defendant has a mental disability, a low IQ, or a learning disorder. (*Id*. at p. 726; cf. *In re Rodriguez* (1975) 14 Cal.3d 639, 655 [punishment was excessive where defendant's "conduct was explained in part by his limited intelligence, his frustrations brought on by intellectual and sexual inadequacy, and his inability to cope with these problems"].) Further, defendant has a criminal history of other sexual offenses and his offenses are escalating in seriousness.

Proceeding to the second "technique" identified by the *Lynch* court, we consider the punishments prescribed in California for more serious offenses. (*In re Lynch*, *supra*, 8 Cal.3d at p. 426.) As to this issue, *Baker* is also instructive. Section 288.7,

subdivision (b) sits "along a spectrum" of offenses involving sex crimes against children, " 'whereby punishment increases as the victim's age decreases and the seriousness of sexual acts increases, with the harshest punishment meted out to adults who orally copulate or penetrate a child aged 10 or younger.' " (*People v. Baker*, *supra*, 20 Cal.App.5th at p. 728.)  Further, as explained in *Baker*, a defendant "convicted of lewd acts or forcible oral copulation of a child under 14 and over 10 years younger than the defendant faces a 25-year-to-life sentence" under the "One Strike" sex offender law (§ 667.61) if certain aggravating factors are found true.  (*Baker*, at pp. 728-729.)  Thus, a comparison of the mandatory 15-year-to-life sentence under section 288, subdivision (a) to the punishments for similar and more serious sex offenses in California "does not suggest this is that 'rarest of cases' in which 'the length of a sentence mandated by the Legislature is unconstitutionally excessive.' " (*Baker*, at p. 730.)

A court need not separately analyze each of the *Lynch* techniques.  (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.)  Therefore, we need not discuss the third *Lynch* technique of comparing defendant's punishment with the same offense in other jurisdictions having an identical or similar constitutional provision.  For the same reasons, we reject defendant's federal constitutional argument.  (See *Harmelin v. Michigan* (1991) 501 U.S. 957, 1005 [115 L.Ed.2d 836, 871] (conc. opn. of Kennedy, J.) ["[I]ntrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality"].)

## C

### *The Abstract Of Judgment Must Be Corrected*

Defendant contends the court erred by prohibiting him visitation with the victim for the entirety of his prison term because the order went beyond the victim's 18th birthday.  The People agree, as do we.  The trial court ordered no visitation between the defendant and the victim pursuant to section 1202.05.  This section prohibits visitation

between a victim and his or her incarcerated abuser until the victim is 18 years old and the provisions no longer apply.  (§ 1202.05; *People v. Scott* (2012) 203 Cal.App.4th 1303, 1319, 1323.)  Thus, the abstract of judgment and sentencing minute order incorrectly reflect defendant was ordered to have no contact with the victim for an unspecified period.  Accordingly, both must be corrected to reflect the court ordered no visitation until the victim is 18 years old.

DISPOSITION

The judgment is affirmed.  The abstract of judgment is ordered corrected to reflect the trial court's order prohibiting defendant visitation with the victim until she is 18 years old.

/s/_____
Robie, J.

We concur:

/s/_____
Blease, Acting P. J.

/s/_____
Murray, J.